1  SCHNEIDER WALLACE
   COTTRELL KONECKY LLP
2  Matthew S. Weiler (SBN 236052)
   Ryan M. Hecht (SBN 322396)
3  2000 Powell Street, Suite 1400
   Emeryville, California 96408
4  Tel: (415) 421-7100; Fax: (415) 421-7105
   mweiler@schneiderwallace.com
5  rhecht@schneiderwallace.com

6  Peter B. Schneider (admitted *pro hac vice*)
   William M. Hogg (admitted *pro hac vice*)
7  3700 Buffalo Speedway, Suite 960
   Houston, Texas 77098
8  Tel: (713) 338-2560; Fax: (415) 421-7105
   pschneider@schneiderwallace.com
9  whogg@schneiderwallace.com

10  *Attorneys for Plaintiff and Class Members*

11                    **UNITED STATES DISTRICT COURT**

12                    **NORTHERN DISTRICT OF CALIFORNIA**

13

14  TIFFANY BRITT, on behalf of all others        Case No. 3:20-cv-04333-WHA
    similarly situated,
15                                                **PLAINTIFF'S RESPONSE IN**
                  Plaintiffs,                     **OPPOSITION TO DEFENDANT'S**
16                                                **MOTION TO COMPEL ARBITRATION**
    vs.                                           **(Dkt. 36)**
17
    CONTEXTLOGIC, INC.,                           Date:    Thursday, November 19, 2020
18                                                Time:    8:00 a.m.
                  Defendant.                      Dept:    Courtroom 12
19                                                Judge:   The Hon. William Alsup

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

I.      INTRODUCTION .............................................................................................. 1

II.     LEGAL STANDARD .......................................................................................... 3

III.    ARGUMENT AND AUTHORITIES ................................................................... 3

        A.  Plaintiff never assented to the Terms of Service, nor the arbitration provision therein, found on Wish.com or the derivative mobile applications. .................................. 3

            i.   Plaintiff never saw the supposed "notice" due to the way Wish.com is designed: to pull the users' visual attention away from the tiny notice language at the bottom corner of the screen by distracting the user with alluring images................................. 4

            ii.  Wish.com's "account creation" and "shopping cart" webpages are similarly designed to divert the user's visual attention away from the supposed notice. Even after *Motley*, Wish.com's users are still forced to ferret out hyperlinks among visual clutter and distraction................................................................................................... 7

        B.  Defendant has failed to provide evidence affirmatively demonstrating an objective manifestation by Plaintiff of mutual assent to the arbitration provision............................ 9

        C.  *Lee v. Ticketmaster* is only instructive here in that it illustrates that Wish.com does not provide "constructive notice" of the purported arbitration agreement. ............................ 12

        D.  Defendant has failed to provide evidence that Plaintiff was confronted with or had actual knowledge of the substance of the arbitration provision to which it seeks to bind her. .... 16

        E.  Plaintiff never agreed to the arbitration provision nor any delegation clause therein. Moreover, the delegation clause itself is unconscionable.................................................. 19

            i.   The delegation clause does not "clearly and unmistakably" delegate enforceability questions to the arbitrator because it conflicts with other provisions in the Terms of Service, and is therefore ambiguous. .................................................................. 20

            ii.  The delegation clause itself is unconscionable. ........................................................ 22

IV.     CONCLUSION................................................................................................. 24

# **TABLE OF AUTHORITIES**

**Cases**

*AT&T Technologies v. Communications Workers*,
    475 U.S. 643 (1986)................................................................................................. 20

*Avila v. Southern Cal. Specialty Care, Inc.*,
    20 Cal. App. 5th 835 (Cal. Ct. App. 2018) ................................................................. 19

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION
*Britt, et al. v. ContextLogic, Inc.*, Case No. 3:20-cv-04333-WHA

*Barclay v. ICON Health & Fitness, Inc.*,
  No. 19-cv-290 (ECT/DTS), 2020 U.S. Dist. LEXIS 191215 (D. Minn. Oct. 15, 2020) ............... 18

*Berkson v. Gogo LLC*,
  97 F. Supp. 359 (E.D.N.Y. 2015) .......................................................................................... 7, 9

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
  No. 17-CV-04570 (LAK) (KHP), 2017 U.S. Dist. LEXIS 192814 (S.D.N.Y. Nov. 20, 2017) ....... 9

*C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Okla.*,
  532 U.S. 411 (2001).................................................................................................................. 22

*Chavez v. Bank of Am.*,
  No. C 10-653 JCS, 2011 U.S. Dist. LEXIS 116630 (N.D. Cal. Oct. 7, 2011) .............................. 19

*Concat LP v. Unilever, PLC*,
  350 F. Supp. 2d 796 (N.D. Cal. 2004) ......................................................................................... 3

*Cortez v. Nationstar Mortg., LLC*,
  No. 8:19-cv-02045-JLS-ADS, 2020 U.S. Dist. LEXIS 82842 (C.D. Cal. Mar. 2, 2020).............. 19

*Cox v. Ocean View Hotel Corp.*,
  533 F.3d 1114 (9th Cir. 2008) ..................................................................................................... 3

*Cross v. Nat'l Union Fire Ins. Co.*,
  No. 2:19-cv-00787-KJM-DB, 2019 U.S. Dist. LEXIS 208356 (E.D. Cal. Dec. 2, 2019)............... 3

*Cruise v. Kroger Co.*,
  233 Cal. App. 4th 390 (2015) ...................................................................................................... 3

*Cullinane v. Uber Technologies, Inc.*,
  893 F.3d 53 (1st Cir. 2018) .......................................................................................................... 7

*Engen v. Grocery Delivery E-Services USA Inc.*,
  453 F. Supp. 3d 1231 (D. Minn. 2020) ....................................................................................... 18

*Estate of Arce by & through Huerta v. Panish Shea & Boyle LLP*,
  No. 19-CV-0500-AJB, 2019 WL 6218781 (S.D. Cal. Nov. 20, 2019)......................................... 19

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995)............................................................................................................. 19, 20

*Freeman v. State Farm Mut. Auto. Ins. Co.*,
  14 Cal. 3d 473 (1975) .................................................................................................................. 3

*Greystone Nevada, LLC v. Anthem Highlands Cmty. Ass'n*,
  549 Fed. Appx. 621 (9th Cir. 2013)............................................................................................. 3

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524, 202 L. Ed. 2d 480 (2019) ................................................................................... 20

*HM DG, Inc. v. Amini*,
  219 Cal. App. 4th 1100 (Cal. Ct. App. 2013) .............................................................................. 4

*In Re Facebook Biometric Info. Privacy Litig.*,
   185 F. Supp. 3d 1155 (N.D. Cal. 2016) ........................................................................ 5

*Knutson v. Sirius XM Radio Inc.*,
   771 F.3d 559 (9th Cir. 2014) ...................................................................................... 6

*Lee v. Ticketmaster L.L.C.*,
   817 Fed. Appx. 393 (9th Cir. 2020) ................................................................... 1, 2, 12

*Lee v. Ticketmaster L.L.C.*,
   No. 18-cv-05987-VC, 2019 U.S. Dist. LEXIS 231894 (N.D. Cal. Apr. 1, 2019) ......... 12

*Lopez v. Bartlett Care Center, LLC*,
   39 Cal. App. 5th 311 (Cal. Ct. App. 2019) ................................................................ 19

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
   514 U.S. 52 (1995) .................................................................................................... 22

*Nguyen v. Barnes & Noble, Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ................................................................................. 4, 9

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016) ............................................................... 7, 10, 17, 18

*Peleg v. Neiman Marcus Group, Inc.*,
   204 Cal. App. 4th 1425 (Cal. Ct. App. 2012) ............................................... 20, 21, 22

*Pinela v. Neiman Marcus Group, Inc.*,
   238 Cal. App. 4th 227 (Cal. Ct. App. 2015) .............................................................. 23

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004) .................................................................................. 9, 18

*Rent-A-Center, W., Inc. v. Jackson*,
   561 U.S. 63 (2010) ......................................................................................... 19, 20, 22

*Rosenthal v. Great Western Fin. Securities Corp.*,
   14 Cal. 4th 394 (1996) ................................................................................................ 6

*Sgouros v. TransUnion Corp.*,
   817 F.3d 1029 (7th Cir. 2016) ................................................................................... 10

*Sgouros v. TransUnion Corp.*,
   Case No. 14 C 1850, 2015 U.S. Dist. LEXIS 13691 (N.D. Ill. Feb. 5, 2015) .............. 17

*Specht v. Netscape Communications Corp.*,
   306 F.3d 17 (2d Cir. 2002) .......................................................................................... 4

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*,
   925 F.2d 1136 (9th Cir. 1991) ............................................................................. 4, 7, 9

*Tiri v. Lucky Chances, Inc.*,
   226 Cal. App. 4th 231 (Cal. Ct. App. 2014) ........................................................ 20, 23

*Wilson v. Playtika, Ltd.*,
    349 F. Supp. 3d 1028 (W.D. Wash. 2018) ..................................................................... 16

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,
    25 Cal. App. 3d 987 (Cal. Ct. App. 1972) ...................................................................... 4

**<u>Other Authorities</u>**

Jonathan Obar et al., "The Biggest Lie on the Internet: Ignoring the Privacy Policies and Terms of
    Service Policies of Social Networking Services," TPRC 44: The 44th Research Conference on
    Communication, Information and Internet Policy, 2016 (June 1, 2018) ....................... 10

Stacy-Ann Elvy, "Contracting in the Age of the Internet of Things: Article 2 of the UCC and
    Beyond," 44 HOFSTRA L. REV. 839 (2016) ................................................................. 10

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

More than eleven hours after Plaintiff Tiffany Britt filed her Motion for Partial Summary Judgment on the issue of contract formation (Dkt. 35), Defendant ContextLogic Inc. filed a motion to compel arbitration. *See* Dkt. 36. In support of that motion to compel, Defendant attached two declarations in support of the argument that Plaintiff "had opportunity" to notice a hyperlink on Defendant's website, Wish.com, that leads to a separate webpage containing Wish.com's Terms of Service. Defendant's motion, however, provides no evidence whatsoever of an objective outward manifestation by Plaintiff of her assert to agree to the Terms of Service, aside from Plaintiff simply visiting Wish.com and making purchases through various mobile applications. There is no signature, no "click box" marked by Plaintiff, no evidence she visited the Terms of Service webpage itself, and no other evidence that Plaintiff manifested an intent to be bound by those terms. Indeed, Plaintiff has provided sworn testimony that she denies seeing any such "notice" language on Defendant's websites. *See* Dkt. 35-1 at ¶¶ 4-5.

The Court must grant Plaintiff the benefit of all reasonable doubts and inferences in opposing a motion to compel arbitration, and the policy in favor of arbitration does not apply until after the Court is satisfied that the parties entered into an agreement to arbitrate. The record in this case, including the record presented by Plaintiff in her Motion for Partial Summary Judgment, demonstrates that Plaintiff never provided an outward manifestation of mutual assent to be bound by Defendant's contractual terms. Moreover, where Plaintiff has denied being alerted to the Terms of Service, the Court should find that Plaintiff never agreed to arbitrate her claims.

Defendant points to a different case involving a separate website, *Lee v. Ticketmaster L.L.C.*, 817 Fed. Appx. 393 (9th Cir. 2020), for the proposition that "similar" browsewrap agreements have been deemed enforceable by the Ninth Circuit. In reality, *Lee v. Ticketmaster* illustrates that Defendant's website should not survive scrutiny. In comparison with *Ticketmaster*, which included a more-noticeable "warning" that was positioned in such a way as to *force* users to see the notice before clicking through to the next page, Defendant's website is specifically designed to *divert* users' visual

attention away from such notice. Wish.com is overly cluttered, the "warning" text is barely noticeable, and the user's attention is specifically drawn away from the supposed "notice" on the applicable web pages.

Moreover, *Ticketmaster* was not decided in the same context of this matter, where at least one court of competent jurisdiction in *Motley v. ContextLogic* has already specifically expressed concerns about the burdens that Wish.com (as opposed to a different website) places on its users to ferret through hyperlinks to find the Terms of Service that ostensibly bind users to an arbitration agreement. In light of *Motley*'s express guidance, the steps taken by Defendant were unduly minimal, and Defendant implemented designs to its website specifically to divert Wish.com's users' eyes *away* from the supposed "notice" of the existence of the Terms of Service. In other words, Defendant's website did not take the meaningful steps advised by *Motley* to comport and designed the website in such a way to ensure users do not see the supposed "notice."

Defendant further argues that a delegation clause found within the Terms of Service "exclusively" reserves for the arbitrator all questions about arbitrability, including enforceability and unconscionability. Even if the Court finds placing small and barely visible text at the bottom of a webpage meets the requirements of an objective manifestation of mutual assent, as a matter of California law, the delegation provision is not a "clear and unmistakable" manifestation of such a delegation, because it ambiguously conflicts with various other provisions of the Terms that allow courts, and not solely the arbitrator, to determine enforceability. Moreover, the delegation provision itself is unconscionable. The delegation provision would impose undue costs, allows Defendant to select the pool of arbitrators, deprives Plaintiff to ability to contest the neutrality of those arbitrators, and forces Plaintiff to split arbitration fees with Defendant, even on the narrow question of whether the arbitration agreement itself should be deemed unenforceable.

The evidence provided by Defendant does not demonstrate that Plaintiff assented to the Terms of Service, and it would be unconscionable to delegate the question of whether the Terms of Service are oppressive and one-sided to an arbitrator whom Defendant can unilaterally select, and for whom Plaintiff will be forced to incur undue costs and fees in litigating that narrow issue. The Court must

afford Plaintiff the benefit of all reasonable doubts and inferences in opposing a motion to compel arbitration. Accordingly, the Court should deny Defendant's motion to compel in its entirety.

## II.   LEGAL STANDARD

"When considering a motion to compel arbitration, a court applies a standard similar to the summary judgment standard[.]" *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (internal quotation marks and citation omitted); *see also Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) ("[D]enial of a motion to compel arbitration has the same effect as a grant of partial summary judgment denying arbitration . . . ."); *Greystone Nevada, LLC v. Anthem Highlands Cmty. Ass'n*, 549 Fed. Appx. 621, 623 (9th Cir. 2013) (reversing an order compelling arbitration when opposing party had been afforded no opportunity to present evidence and argument).

The party opposing arbitration receives the benefit of any reasonable doubts, and the court draws reasonable inferences in that party's favor; only when there are no genuine disputes of material fact calling into question the arbitration agreement's existence and applicability may the court compel arbitration. *Cross v. Nat'l Union Fire Ins. Co.*, No. 2:19-cv-00787-KJM-DB, 2019 U.S. Dist. LEXIS 208356, at *10 (E.D. Cal. Dec. 2, 2019).

## III.   ARGUMENT AND AUTHORITIES

### A.   Plaintiff never assented to the Terms of Service, nor the arbitration provision therein, found on Wish.com or the derivative mobile applications.

"Under 'both federal and state law, the threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate.'" *Cruise v. Kroger Co.*, 233 Cal. App. 4th 390, 396 (Cal. Ct. App. 2015) (italics omitted). "There is indeed a strong policy in favor of enforcing agreements to arbitrate, but there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . ." *Freeman v. State Farm Mut. Auto. Ins. Co.*, 14 Cal. 3d 473, 481 (1975).

This requirement applies with equal force to arbitration provisions contained in contracts purportedly formed over the internet. While internet commerce has exposed courts to many new situations, it has not fundamentally changed the requirement that "'[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.'" *Nguyen v. Barnes*

& *Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and **not their unexpressed intentions or understandings**." *HM DG, Inc. v. Amini*, 219 Cal. App. 4th 1100, 1109 (Cal. Ct. App. 2013) (emphasis added).

In applying this objective standard, outward manifestations of a party's supposed assent are to be judged with due regard for the context in which they arise. California law is clear—"an offeree, regardless of *apparent* manifestation of his consent, is *not bound by inconspicuous contractual provisions of which he was unaware*, contained in a document whose contractual nature is not obvious." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (Cal. Ct. App. 1972) (emphasis added); *see Specht v. Netscape Communications Corp.*, 306 F.3d 17, 30 (2d Cir. 2002) (applying California law to commercial Internet transaction).

In determining whether Defendant can prove the essential elements of contract formation, "[t]he district court . . . should give to the party [opposing arbitration] the benefit of all reasonable doubts and inferences that may arise." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991). "If there is doubt as to whether such an agreement exists," Defendant cannot carry its burden and thus no contract can be found. *Id.*

### i. Plaintiff never saw the supposed "notice" due to the way Wish.com is designed: to pull the users' visual attention away from the tiny notice language at the bottom corner of the screen by distracting the user with alluring images.

Here, Plaintiff has provided sworn testimony that she never saw or noticed the supposed "warning" language on Wish.com or its mobile applications. *See* Dkt. 35-1 at ¶¶ 4-5. In relevant part, Plaintiff testified as follows:

> Since my initial enrollment with Wish in 2016, I have occasionally accessed Wish.com or one of the Wish mobile application. I do not recall, on any of those occasions . . . ever having been presented with, notified of, or asked to agree or consent to any "Terms of Service" or any other agreement or contractual terms, by Defendant or anyone else. I certainly do not recall ever having been presented with, notified of, or asked to agree or consent to any agreement or contractual terms that would have constituted an agreement to arbitrate any disputes with Defendant or that otherwise would have given up any of my legal rights to which I am entitled, including my right to demand a jury trial. **Had I ever been presented with any such notice, reference, or request, I would not have provided my agreement or consent**. I value my legal

1   rights and would never relinquish them in exchange for access to or use
    of Defendant's discount website or mobile applications.

2   *Id.* at ¶ 5 (emphasis added).

3       This testimony comports with the common sense indication that Defendant's practice of simply

4   providing a link to its "Terms of Service," without warning as to what kind of provisions and promises

5   are actually contained *within* those terms, is insufficient to show that Plaintiff provided an outward

6   and objective manifestation of assent to be bound by such terms simply by using the website.

7       As discussed in more detail in Plaintiff's Motion for Partial Summary Judgment, the court in

8   *Motley v. ContextLogic, Inc.*, No. 3:18-cv-02117-JD, 2018 U.S. Dist. LEXIS 192447 (N.D. Cal. Nov.

9   9, 2018) addressed a similar concern with an older version of Defendant's website, Wish.com. In

10  *Motley*, Judge Donato found that Defendant was unable to prove that a plaintiff assented to the Terms

11  of Service based upon Wish.com's fundamental website operation, noting the website:

12      fall[s] far short of evidencing an assent to arbitration. **None of the [web**
        **pages] presented the specifics of Wish.com's terms of service or**
13      **required [Plaintiff] to review the terms in conjunction with a**
        **request for agreement or acceptance**. *See In Re Facebook Biometric*
14      *Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1165 (N.D. Cal. 2016). None
        of the screens asked [Plaintiff] to click the equivalent of a "Sign Up"
15      box of any sort that might indicate acceptance of the terms of service.
        *Id.* at 1166. The screens also did not provide any notice that merely
16      using the website would be deemed acceptance of the terms of service.
        The only thing ContextLogic's screens featured was an unadorned
17      hyperlink to the terms of service.

18      . . .

19      An agreement to arbitrate cannot be found on this record.

20  2018 U.S. Dist. LEXIS 192447 at *3-4 (emphases added).

21      After the *Motley* decision, Defendant updated its website to address only the narrow issue of

22  "providing notice that merely using the website would be deemed acceptance of the terms of service."

23  *Id.* Notably, Defendant's changes do nothing to meaningfully address one of the main points identified

24  in the *Motley* decision: that the burden is on website owners to put users on notice of the terms to

25  which they wish to bind users, and not on consumers to "ferret out hyperlinks to terms and conditions

26  to which they have no reason to suspect they will be bound." *Motley*, 2018 U.S. Dist. LEXIS 192447,

27  at *5 (citing *Nguyen*, 763 F.3d at 1179).

28

As evidenced by the record in this case, the "notice" provided by Defendant included a single line, in tiny font, color formatted in light grey on top of a white background, and hidden in the bottom corner of the "log in" screen. *See* Dkt. 35-4. The language merely says that by logging in, the user "agree[s] to the Wish Terms of Use[,]" without any language indicating that "agreeing to the terms of use" actually means the formation of a binding contract. *Id.* For all unsuspecting users know, those non-legal usage of the word "terms" in "Terms of Use" could be purely informational in nature (i.e., "terms of use" can be reasonably read as consisting of guidelines about how to use the website, or rules about prohibited use of the website).[1] There is no mention of a contract, no mention of arbitration, and no mention that simply signing in or using the website would force users to give up their substantive legal rights. Plaintiff and other users who visit Wish.com are not expressly told or warned that the "terms or use" or "terms of service" constitute a binding contract. As Plaintiff testified, had Defendant actually met its burden to inform her that using the website would result in forfeiture of her rights, she would not have done so. *See* Dkt. 35-1 at ¶ 5.

Visually, the vast majority of the screen is dominated by bright and alluring images that scroll up and down (much like a slot machine) consisting of advertisements for all types of salacious products available for purchase on Wish.com, including images of partial nudity, weapons and gun accessories, sex toys, jewelry, and other visually appealing items. *See* Dkt. 35-4 (Wish.com log in screens). The effect of this practice was that users who visit and sign in to Wish.com do not see the tiny print including the "warning" language on the bottom corner of the webpage. Indeed, no reasonable user of Wish.com would forego looking at these salacious images in favor of ferreting out the tiny print on the opposite corner of the web page. The visual attention of the user is pulled away from that portion of the website and drawn instead towards the bright and moving images on the opposite side of the webpage. Plaintiff's experience comports with the practical reality of Defendant's web designs— Plaintiff never saw this supposed "notice." *See* Dkt. 35-1 at ¶ 5.

---

[1] The party to be bound has to know the document is a contract, as opposed to something else, such as a receipt or informational guidelines. *See Rosenthal v. Great Western Fin. Securities Corp.*, 14 Cal. 4th 394, 420 (1996); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 567 (9th Cir. 2014).

Here, where the Court must give Plaintiff "the benefit of all reasonable doubts and inferences that may arise[,]" *Three Valleys*, 925 F.2d at 1140-41, no contract can be found on the record currently before the Court.

### ii. Wish.com's "account creation" and "shopping cart" webpages are similarly designed to divert the user's visual attention away from the supposed notice. Even after *Motley*, Wish.com's users are still forced to ferret out hyperlinks among visual clutter and distraction.

The same is true upon creating a new user account or at the checkout webpage to purchase items on Wish.com: the "notice" language provided by Defendant is simply insufficient to put Plaintiff or any other Wish.com user on actual or constructive notice that creating an account or completing a purchase will subject the user to strict and one-sided limitations of liability, a $100 cap on damages, or subject them to arbitration.

As an illustrative example, in support of its motion, Defendant attached the "create an account" screen from one of Wish.com's derivative mobile applications, "Geek." The Geek sign up page is similar in design to the Cute and Wish mobile application sign-up pages discussed in Plaintiff's Motion for Partial Summary Judgment. *Compare* Dkt. 36-4 (Geek sign up page) *with* Dkt. 35-6 (Cute and Wish sign up pages). As these "sign up" pages illustrate, the text and hyperlink that Defendant claims to constitute sufficient notice of the arbitration provision (1) appear in smaller font than other text on the screen, (2) are not bold, capitalized, or conspicuous in light of the whole webpage, and (3) fail to adequately notify visitors of the terms to which the hyperlinked text directs. *See Nicosia v. Amazon, Inc.*, 834 F.3d 220, 236-37 (2d Cir. 2016); *see also Berkson v. Gogo LLC*, 97 F. Supp. 359, 404 (E.D.N.Y. 2015) (holding a "terms of use" hyperlink "insufficient to give adequate notice" because it was "not in large font, all caps, or in bold"); *Cullinane v. Uber Technologies, Inc.*, 893 F.3d 53, 62-64 (1st Cir. 2018).

Importantly, as with the Wish.com home page discussed above, the "account creation" pages on the mobile applications also include alluring and bright images that scroll horizontally at the top of the screen, which pulls the user's attention *away* from the bottom portion of the screen where the "notice" language is placed (in small and difficult to read print). If those visually distracting images were not enough, Defendant also routinely includes large and bright countdown timers that entice

1  users like Plaintiff to sign up fast in order to get a reward, such as a "free gift" and a 10% discount.

2  *See* Dkt. 35-5 at 2. Ostensibly the purpose of such a countdown timer is to push prospective users to

3  sign up fast. In so doing, Defendant has included more clutter and distraction onto the screen that not

4  only pulls the users' attention away from the supposed "notice," but entices the users to sign up quickly

5  to preclude as many users as possible from noticing the "fine print." As Plaintiff has testified, these

6  visual tactics worked exactly how Defendant designed them to work—Plaintiff never saw this

7  supposed "notice." *See* Dkt. 35-1 at ¶ 5.

8        The "checkout" and "purchase" pages on Geek fare no better. For one thing, Defendant has

9  declined to attach copies of any of the actual web pages that Defendant claims Plaintiff visited to

10  consummate the "multiple purchases" on Wish.com. Instead, Defendant has attached a hand-picked

11  "template" webpage that Defendant contends is representative of the *kind* of webpage Plaintiff would

12  have seen at the purchase phase of her Wish experience. *See* Dkt. 36-1 at p. 8-10. As Plaintiff has

13  made clear, she did not see this supposed "notice" language on any of Defendant's webpages, which

14  would include on checkout screens. *See* Dkt. 35-1 at ¶ 5.

15        A review of the "template" screens provided by Defendant illustrate why Plaintiff did not see

16  these supposed notices. Again, the purported "warning" language is in smaller, light grey font on a

17  white background at the bottom of the screen. *See* Dkt. 36-7 at 2-3. The pages are prompting the user

18  to actively view features and make selections at the top of the screen, *away* from that small and difficult

19  to read language. *Id.* For example, the "cart" screen is specifically prompting the user to select the

20  shipping options placed at the top of the screen, *id.* at 2, and the "order summary" page includes the

21  product picture and item description at the top, a bright and bolded "alert" notification letting the user

22  know they can receive a 7% discount by turning on push notifications, and both pages ask for coupon

23  entries. *Id.* at 2-3. These distracting visual features specifically pull the user's visual attention away

24  from the tiny and difficult to read "notices." Importantly, users are not *confronted with* nor *forced* to

25  see this "notice" language before they click to the next screen.

26        The overall effect of Defendant's web design, in practice, goes against Judge Donato's primary

27  concerns as stated in the *Motley* decision: the burden is on **Defendant** to put users on notice of the

28

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION *Britt, et al. v. ContextLogic, Inc.*, Case No. 3:20-cv-04333-WHA

terms to which they wish to bind users, and not on consumers to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound. *Motley*, 2018 U.S. Dist. LEXIS 192447, at *5 (citing *Nguyen*, 763 F.3d at 1179). Defendant specifically re-designed Wish in the wake of *Motley* to place as many visual obstacles in users' way that Defendant could fit onto a screen at one time, while avoiding its burden of confronting users with the notice language. The practical effect of this re-design is that users like Plaintiff are still forced to fight against their own human nature to focus their attention on colorful moving objects in an effort to search for hyperlinks to terms and conditions hidden in the bottom corner of a webpage. Indeed, in direct attribution to Defendant's webpage designs, Plaintiff cannot recall ever seeing this "notice" at all. *See* Dkt. 35-1 at ¶ 5. That is because she, like any other reasonable user of Wish.com, should not be expected to scour Defendant's web pages to search for the legal landmines.

All reasonable doubts must be resolved in Plaintiff's favor. *Three Valleys*, 925 F.2d at 1140-41. As such, the Court should deny Defendant's motion to compel.

### B. Defendant has failed to provide evidence affirmatively demonstrating an objective manifestation by Plaintiff of mutual assent to the arbitration provision.

Contracts formed on the internet come primarily in two flavors: "clickwrap" or "click-through" agreements, in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use; and "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen. *Nguyen*, 763 F.3d at 1175-76 (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 428-30 (2d Cir. 2004)). Numerous hybrids and combinations of these flavors have arisen in recent years, including a "sign-in wrap" type of agreement that does not require users to click a box showing acceptance of the terms in order to continue, but rather notifies the user of the existence and applicability of the website's terms of use when proceeding through the sign-in or login process. *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570 (LAK) (KHP), 2017 U.S. Dist. LEXIS 192814, at *7 (S.D.N.Y. Nov. 20, 2017) (citing *Berkson*, 97 F. Supp. 3d at 399).

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen*, 763 F.3d at 1175. Thus, companies like

1    Defendant that seek to enforce the terms of an online take-it-or-leave-it contract bear the burden of

2    establishing, on **undisputed facts**, that the provisions of the contract were clearly communicated and

3    accepted. *Id.* (explaining that the "onus must be on website owners to put users on notice of the terms

4    to which they wish to bind consumers," for "consumers cannot be expected to ferret out hyperlinks to

5    terms and conditions to which they have no reason to suspect they will be bound"). Determining

6    "whether the web pages presented to the consumer adequately communicate all the terms and

7    conditions of the agreement, and whether the circumstances support the assumption that the purchaser

8    receives reasonable notice of those terms" is "a fact-intensive inquiry," *Sgouros v. TransUnion Corp*.,

9    817 F.3d 1029, 1034-35 (7th Cir. 2016), which "depends heavily" on "the design and content" of the

10   relevant webpages or mobile-phone applications. *Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 233 (2d

11   Cir. 2016); *see also Nguyen*, 763 F.3d at 1177-78.

12           At least one trial court has already noted the ever-shifting and difficult analysis that these types

13   of hybrid "wrap" web pages force upon judges. As Judge Karnow in the Superior Court for San

14   Francisco County astutely observed, "[t]he fictional 'reasonable person' may be held by a court to

15   know e.g., terms of service, but this isn't usually true in the real world. For example, in the social

16   media context (admittedly not that here) **a study confirmed what readers surely suspect, which is**

17   **that almost no one reads the terms of services and privacy policies.**[] In the study's use of a

18   fictitious site, **98% missed the 'gotcha clauses' by which the user agreed to provide his or her**

19   **first born child in return for the service**." *Talbot v. Lyft, Inc.*, Case No. CGC-18-566392, 2018 Cal.

20   Super. LEXIS 6553, at *5-6 n.5 (San Francisco Sup. Ct., Dec. 21, 2018) (emphasis added) (citing

21   Stacy-Ann Elvy, "Contracting in the Age of the Internet of Things: Article 2 of the UCC and Beyond,"

22   44 HOFSTRA L. REV. 839 (2016); Jonathan Obar et al., "The Biggest Lie on the Internet: Ignoring the

23   Privacy Policies and Terms of Service Policies of Social Networking Services," TPRC 44: The 44th

24   Research Conference on Communication, Information and Internet Policy, 2016 (June 1, 2018),

25   available at https://ssrn.com/abstract=K2757465).

26           Even in the ever-changing online and mobile application context, the hyperlinks leading to

27   Defendant's Terms of Service are designed to be visually ignored in favor of the alluring images that

28

pull the user's attention away from the supposed "notice," which is written in tiny, difficult-to-read font that sits at the bottom corner of the website. Whether a reasonable Wish.com user would actually see this "warning" language is important in deciding whether it provides constructive notice. As the studies cited by Judge Karnow illustrate, virtually no users see or review the terms of service, even when the fate of their first born is at stake. Defendant knows as much because it knows how many people view the Terms of Service webpage in comparison to its other webpages, and designed its website in such a way to leverage that fact to ensure virtually nobody views the Terms of Service.

Defendant has provided evidence that Plaintiff accessed and visited Wish.com's account creation page, log in page, and "shopping cart" pages on various occasions since 2016. *See generally* Dkt. 36-1. Notably, ***Defendant has not provided any evidence that Plaintiff ever visited the Terms of Service webpage***. That is because, as Plaintiff testified, she never saw this supposed "warning" language hidden at the bottom of Wish.com's webpages. *See* Dkt. 35-1 at ¶ 5. It does not stand to reason that just by visiting a webpage, that necessarily means a website user sees all of the visual information on that webpage. Indeed, as discussed above, Wish.com is designed in such a way to distract users' visual attention away from the supposed "notice" language. This leaves the Court with an unenviable task: to infer what a "reasonable user" would see when they visit Wish.com.

Defendant is no doubt capable of including a "click wrap" feature or a module that confronts users with the actual contractual terms at issue here, which would have ostensibly provided the hard evidence of mutual assent to make the Court's job easier on this question. Defendant declined to do so. After *Motley*, Defendant was hoping the changes it made to its website would accomplish two goals: make sure its users did not see the notice at the bottom corner of Wish.com's webpages while still facially attempting to pass the legal smell test (i.e., transform Wish.com into a hybrid "sign in wrap"). Defendant attempted to accomplish this result by cluttering its webpages with large, alluring, and moving images, count-down timers, notices about discounts and free gifts, prompts for the user to make selections on the other side of the webpage away from the notice language, and placing the "notice" language on the page in such a way that users are not forced or confronted with the language before their eyes look at the operative button. And even then, the language provided by Defendant did

not include any information alerting users that the "Terms of Service" explicitly included a *contract* of any sort, an arbitration agreement, or alterations of the users' legal rights. Not only was it meant to be missed, it was drafted to look innocuous.

Wish.com's users, including Plaintiff, do not see the "notice," are not apprised of the actual contents of the Terms of Service, and use the website without knowing that Defendant has inserted hidden contractual terms on a separate webpage, for which Defendant only provides an innocuous hyperlink. Plaintiff has testified that she never assented to these Terms of Service or the arbitration provision therein. *See* Dkt. 35-1 at ¶ 3. Other than including an innocuous hyperlink on its webpages, Defendant never took the affirmative step to present or confront Plaintiff with the actual contents of the Terms of Service. *Id.* Defendant has produced no signature, no "checked box," no evidence that Plaintiff visited the Terms of Service webpage, and no evidence whatsoever that Plaintiff outwardly manifested her assent to be bound by the arbitration provision. Instead, Defendant places the burden on Plaintiff and other users of Wish.com to ferret out those Terms of Service for themselves, places obstacles in the users' way, and hopes such facile steps will pass muster in a court of law.

### C. *Lee v. Ticketmaster* **is only instructive here in that it illustrates that Wish.com does not provide "constructive notice" of the purported arbitration agreement.**

Defendant points to *Lee v. Ticketmaster L.L.C.* to argue that the Ninth Circuit has recently approved a "sign in wrap" website in Ticketmaster, and should do the same here. *See* Dkt. 36 at 25. A cursory review of *Ticketmaster* illustrates that the notice utilized by Wish.com was indeed very different from the Ticketmaster website touted by Defendant as "very similar." *Id.*

At the district court level in *Ticketmaster*, Judge Chhabria granted a motion to compel based on "evidence that Lee was required to assent to the terms whenever he placed orders for tickets" because Ticketmaster "provided notice of the terms of use adjacent to the 'Place Order' button, included a hyperlink to the terms in contrasting color, and informed the user that 'continuing past this page' . . . would indicate assent to the terms." *See Lee v. Ticketmaster L.L.C.*, No. 18-cv-05987-VC, 2019 U.S. Dist. LEXIS 231894, at *1-2 (N.D. Cal. Apr. 1, 2019). It does not appear plaintiff argued that there was no mutual assent from viewing the website generally. Instead, the plaintiff in that case

focused his argument on the fact that Ticketmaster's terms did not originally include an arbitration clause, and Ticketmaster did not notify users when the terms were amended, which Judge Chhabria found unpersuasive. *Id.* at *2. Aside from noting the hyperlink to the terms of use was in a different color, there was no discussion whatsoever in Judge Chhabria's opinion about whether Ticketmaster's webpage was designed to divert the users' attention away from the notice.

To the extent *Ticketmaster* is instructive, we need to compare the webpages to determine whether the notice provided by Ticketmaster's website to its users is sufficiently similar to hold Wish.com's users to the same standard. A review of the "Place Order" pages from these separate websites reveals that the websites are different in visual design. For example, as provided by Defendant in a separate but related case, *Archuleta v. ContextLogic, Inc.*, Case No. 4:20-04331-SBA, Dkt. 29-12, Defendant provided the full webpage that was submitted as evidence in the *Ticketmaster* case.[2]

The Ticketmaster "Place Order" page includes the "warning" language about the Terms of Use directly below the total price of the tickets and directly above the "Place Order" button, right near a brightly colored image showing the ticket to be purchased (in that example, a picture of Justin Timberlake). *Id.* As indicated by the padlock symbol, the user cannot click the "Place Order" button until *after* they have entered their billing information. Importantly, the "warning" language is placed in between an alluring image where Ticketmaster knows the users' visual attention must be drawn and the "Place Order" button. *Id.* This means, in the normal course of seeing that image, reviewing the total price, and clicking the button, the user is confronted with the notice in the normal course of reading the page: left to right, top to bottom. They are forced to see this notice before their eyes reach the "Place Order" button.

In comparison, Wish.com's "Place Order" process is starkly different. In researching this process, counsel for Plaintiff walked through these steps on Wish.com as follows:

1. Log on to Wish.com (*see* Dkt. 35-4);

[2] Plaintiff requests the Court take judicial notice of that docket entry, and attaches a true and correct copy of same herein as Exhibit 1 for ease of reference.

2. As soon as a user logs in, they are immediately confronted with a multitude of advertisements that Wish.com promotes on its "main feed" home page (*see* Declaration of William Hogg, Exhibit A);

3. One of the "featured" items promoted by Defendant that a user might see is a product named "New Women's Eyelashes fashion color eye makeup for Beauty eye," listing the product for sale at $4.75 (after a purported discount of 87%) (*id.*);

4. After clicking on the product picture, the user is taken to the product description page, which includes images illustrating that these "eyelashes" for sale actually include the bundled sale of plano colored contact lenses (*id.*, Exhibit B);

5. After selecting the color choice of contact lens the user wants to purchase, the user then clicks the "Buy" button and is taken to the "Place Order" webpage (*id.*, Exhibit C); and

6. If a user has made a previous purchase on Wish.com, the billing and shipping information is pre-populated. After entering the shipping and billing information, the user clicks "Place Order" and the transaction is complete and the user is taken to the order confirmation/order detail page (*id.*, Exhibits C-D).

The "Place Order" page on Wish.com is designed differently from the Ticketmaster "Place Order" page in that, unlike with Ticketmaster, there are no alluring graphics on Wish.com's webpage near the "warning" language. *Compare* Hogg Decl., Exhibit C (Wish.com) *with* Exhibit 1 (Ticketmaster). The "warning" language on Ticketmaster's page is included directly beneath the total price and directly above the "Place Order" button, which comports with the normal everyday method of reading the English language, and maximizes the probability that users will read that "notice" before their eyes reach the "Place Order" button. *See* Exhibit 1.

In contrast, Wish.com's "warning" language is placed *beneath* the "Place Order" button, in smaller font than all the surrounding text. Not only would it be against users' natural reading progression to read from bottom to top, but once a user clicks "Place Order," they are immediately taken to the order confirmation page. Unlike Ticketmaster, users are not confronted with or forced to

1   read the "warning" language as part of the natural progression of reading English before their eyes get

2   to the "Place Order" button.

3   Importantly, the graphics of the purchase on Wish.com are positioned on the opposite side of

4   the page from the "warning" language (*see* Hogg Decl., Exhibit C), while on Ticketmaster those

5   graphics are included directly adjacent to the "warning" language. *See* Exhibit 1. Meaning that, even

6   if a user were to review the order before finalizing the purchase, their eyes would be taken away from

7   the "warning" language before clicking "Place Order." After they click "Place Order," they are taken

8   away to a different webpage altogether and it is then too late to review the "warning" language before

9   completing the sale.

10   The ultimate effect of Wish.com's webpage design, as with all of its other webpage designs,

11   is to pull the users' attention away from the "warning" language as much as possible, and to avoid

12   confronting the user with the contents of the Terms of Service at every turn. This was not at issue in

13   the *Ticketmaster* case, and neither the trial court nor the Ninth Circuit considered visual tactics similar

14   to those employed on Wish.com.

15   *Ticketmaster* was also decided on much different procedural grounds than are present in this

16   case. Here, Defendant was specifically counseled by Judge Donato in the *Motley* decision that the

17   burden is on Defendant, and not on Wish.com's lay users, to put the users on notice of the terms to

18   which they wish to bind them. *Motley*, 2018 U.S. Dist. LEXIS 192447, at *5. Defendant took facile

19   steps so that they could claim with a straight face that "notice" language was included on the webpages,

20   but in substance have specifically designed their websites in such a way to divert users' attention away

21   from that "notice," in hopes of tying users to an agreement that Defendants know the users do not see

22   or read.

23   Importantly, Judge Donato considered a similar argument made by Defendant in this case and

24   rejected it. In *Motley*, Defendant made much of the fact that the "Order History" screens "featured a

25   box asking if the user would like to receive text messages from Wish.com, along with an asterisked

26   statement that 'Message and data rates apply. Click here for more details.'" *Id.* In other words,

27   attempted to confront users with a pop up that included a link to the Terms of Service. Defendant

28

highlighted the fact that the "here" was a hyperlink to the Terms of Service, and the "imperative mood of the screen language and the presence of the hyperlink were enough to put Motley on notice that she was subject to the terms of service." *Id.* at *5-6. Judge Donato flatly disagreed with that argument, noting the hyperlink was reasonably interpreted as referring to the message and data rates, and not the terms of service. *Id.* at *6.

Judge Donato noted that such an argument "goes too far" because the checkbox screen was "substantively indistinguishable from the log-in screen, and so faces the same fate[.]" *Id.* The same is true here, even after that sage guidance from Judge Donato.

### D. Defendant has failed to provide evidence that Plaintiff was confronted with or had actual knowledge of the substance of the arbitration provision to which it seeks to bind her.

If Defendant actually intended to do the work of putting users on notice of the contents of the Terms of Service in order to bind those users to an arbitration agreement, as Judge Donato's opinion counsels, Defendant could have included a click-wrap agreement. Defendant could have also inserted a pop-up or module that actually confronts users with the substance of the Terms of Service before allowing the user to go past the log in screen. Such methods have been roundly accepted by courts across the country as constituting proper notice of an arbitration agreement. *See, e.g., Wilson v. Playtika, Ltd.*, 349 F. Supp. 3d 1028, 1037-38 (W.D. Wash. 2018) ("The defining features that makes clickwrap agreements regularly valid are the ***forced confrontation with the terms and the forced decision to accept or reject them by clicking a button***. However, even if a website or app contains just a hyperlink to the terms, courts have been more willing to find a valid agreement if the user is still forced to somehow manifest their assent to the terms, as opposed to passively browsing the site. The key questions in such situations is whether the website or app adequately informs a reasonable user that by clicking a certain button they are also agreeing to be bound by the terms.") (emphasis added) (citations omitted)

As discussed above, these ever-increasing forms and variations of the "sign in wrap" hybrid arrangement put an onerous burden on courts to determine whether the specific design and language used on a party's website is "conspicuous enough" for the Court to infer that an ordinary user of the

website would be put on notice that using the website constitutes a binding agreement to contractual terms contained on a separate webpage.

The problem is that these hybrid "wrap" webpages, much like browsewrap agreements, do not gather hard evidence of "actual knowledge of terms at issue," such as a checked box or a signature. *See Sgouros v. TransUnion Corp.*, Case No. 14 C 1850, 2015 U.S. Dist. LEXIS 13691, at *17 (N.D. Ill. Feb. 5, 2015) (noting that where there is a lack of evidence of actual knowledge, the validity of a browsewrap agreement "hinges on whether a website provided reasonable notice of the terms of the contract, i.e., whether users could have completed their purchase without ever having notice that their purchases are bound by the terms."). Instead, Defendant's motion asks the Court to undertake an evidentiary finding that is, in fact, Defendant's burden by requiring the Court to fill in the evidentiary gap and determine whether an ordinary user would or would not see the notice and thereby be bound by the agreement.

While some courts have made such a finding in various circumstances, such as the Barnes & Noble or the Ticketmaster websites, Defendant's website cannot bridge that evidentiary gap for the reasons stated above: Wish.com is specifically designed to divert users' attention away from the "notice" language. Plaintiff has provided sworn testimony that she did not notice the "warning" language on Wish.com. *See* Dkt. 35-1 at ¶ 5. Because the benefit of all reasonable doubts and inferences must be resolved in Plaintiff's favor here, the Court should find that Defendant has failed to carry its burden.

On this point, *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016) is particularly instructive. In *Nicosia*, the Second Circuit held that Amazon failed to show the plaintiff was on notice of and agreed to mandatory arbitration where it chose not to employ a "clickwrap" mechanism, and instead included "sign in wrap" language on an order page stating placement of the order indicated agreement to conditions of use. *Id.* at 236-38. As discussed in more detail in Plaintiff's Motion for Partial Summary Judgment, the webpages discussed in *Nicosia* were far less cluttered and distracting than are at issue with Wish.com. *See* Dkt. 35 at 19-20 (memorandum pages 13-14).

The court in *Nicosia* specifically noted that "unlike typical 'clickwrap' agreements, clicking

1   'Place your order' **does not specifically manifest assent to the additional terms, for the purchaser**

2   **is not specifically asked whether she agrees or to say 'I agree.'** [] Nothing about the 'Place your

3   order' button alone suggests that additional terms apply, and the presentation of terms is not directly

4   adjacent to the 'Place your order' button so as to indicate that a user should construe clicking as

5   acceptance." *Nicosia*, 834 F.3d at 236-37 (citations omitted).

6           Defendant chose not to employ a clickwrap mechanism with Wish.com, and chose not to

7   confront users with the actual language within the Terms of Service (such as a pop-up putting the

8   Terms of Service in front of the user before they can proceed, as opposed to a hyperlink to a different

9   webpage containing those terms). While clickwrap agreements that display terms in a scroll box and

10  require users to click an icon are not necessarily required, *see Register.com*, 356 F.3d at 403, they are

11  certainly the easiest method of ensuring that terms are agreed to. *See Starkey v. G Adventures, Inc.*,

12  796 F.3d 193, 197 n.3 (2d Cir. 2015) (noting that it would have been "simpler to resolve" this question

13  had a clickwrap mechanism been used); *see also Barclay v. ICON Health & Fitness, Inc.*, No. 19-cv-

14  290 (ECT/DTS), 2020 U.S. Dist. LEXIS 191215, at *29 (D. Minn. Oct. 15, 2020) (noting that in

15  determining mutual assent with respect to online agreements "a user typically must either

16  'affirmatively acknowledge' the terms by, for example, clicking or checking a box, or else **be**

17  **confronted by an 'explicit textual notice'** that continuing to use the website will constitute agreement

18  to the terms." (emphasis added) (citing *Engen v. Grocery Delivery E-Services USA Inc.*, 453 F. Supp.

19  3d 1231, 1237 (D. Minn. 2020)).

20          Here, Plaintiff was neither confronted by the contents of the Terms of Service or an "explicit

21  textual notice," nor was Plaintiff required to provide any type of hard evidence that would typically

22  constitute an objective outward manifestation of her assent to be bound by the arbitration provision.

23  Given the clutter and visually distracting nature of Defendant's webpages, Plaintiff never saw the

24  "warning" language at the account creation, log in page, or purchase pages of Defendants' websites.

25  *See* Dkt. 35-1 at ¶ 5. Defendant could have easily confronted Plaintiff with the actual terms of the

26  contract to which it seeks to bind Plaintiff, but instead chose to design their website in such a way to

27  avoid confronting users with explicit textual notice that using Wish.com will constitute a binding

28

contractual agreement that curtails the users' substantive legal rights.

**E.  Plaintiff never agreed to the arbitration provision nor any delegation clause therein. Moreover, the delegation clause itself is unconscionable.**

Defendant argues that questions of unconscionability should be left to the arbitrator. *See* Dkt. 36 at 20. However, "[w]hether an agreement to arbitrate exists is a threshold issue of contract formation and state contract law." *Lopez v. Bartlett Care Center, LLC*, 39 Cal. App. 5th 311, 317 (Cal. Ct. App. 2019) (quoting *Avila v. Southern Cal. Specialty Care, Inc.*, 20 Cal. App. 5th 835, 843 (Cal. Ct. App. 2018)); *see also Estate of Arce by & through Huerta v. Panish Shea & Boyle LLP*, No. 19-CV-0500-AJB, 2019 WL 6218781, at *4 (S.D. Cal. Nov. 20, 2019) ("the threshold issue of whether a contract was ever formed is for this Court to resolve.").

The question of whether the parties have formed an enforceable arbitration agreement is an issue of contract formation under California law. *See Chavez v. Bank of Am.*, No. C 10-653 JCS, 2011 U.S. Dist. LEXIS 116630, at *25-30 (N.D. Cal. Oct. 7, 2011) (analyzing the enforceability of an arbitration agreement on unconscionability grounds, even though the arbitration agreement included a delegation provision). While it is true that parties can agree to delegate arbitrability to an arbitrator, courts "should not assume that the parties agreed to arbitrate 'gateway issues' unless there is **clear and unmistakable** evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (emphasis added) (internal quotation marks and brackets omitted).

Before the Court may enforce a delegation provision, it must determine whether it is valid. *Cortez v. Nationstar Mortg., LLC*, No. 8:19-cv-02045-JLS-ADS, 2020 U.S. Dist. LEXIS 82842, at *19 (C.D. Cal. Mar. 2, 2020).

"An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010). Specifically, the "additional agreement"—the delegation provision—"is valid under § 2 [of the FAA] 'save upon such grounds as exist at law or in equity for the revocation of any contract,' and federal courts can enforce the agreement by staying federal litigation under § 3 and compelling arbitration under § 4." *Id.* (quoting 9 U.S.C. § 2). In determining whether the delegation provision is

valid, the Court must consider only arguments directed specifically at the delegation provision rather than the Arbitration Agreement as a whole.

Under *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 202 L. Ed. 2d 480 (2019), a court must first determine if a valid arbitration agreement exists between the parties before enforcing a delegation provision within that arbitration agreement. As discussed above, Defendant has provided no concrete evidence showing that Plaintiff expressed an objective manifestation of assent to be bound by the arbitration provision, nor the delegation clause found therein. Because Plaintiff never saw, noticed, or agreed to the Terms of Service (*see* Dkt. 35-1 at ¶ 5), she necessarily was not put on notice nor agreed to any delegation provision found therein.

> **i.    The delegation clause does not "clearly and unmistakably" delegate enforceability questions to the arbitrator because it conflicts with other provisions in the Terms of Service, and is therefore ambiguous.**

For a delegation clause to be effective, two prerequisites must be satisfied. First, the language of the clause must be "clear and unmistakable." *Rent-A-Center*, 561 U.S. at 69; *Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231, 242 (Cal. Ct. App. 2014). The required clear and unmistakable expression is a "heightened standard", *Rent-A-Center*, 561 U.S. at 69, fn. 1, "pertain[ing] to the parties' manifestation of intent, not the agreement's validity. … [I]t is an 'interpretive rule,' based on an assumption about the parties' expectations. In 'circumstance[s] where contracting parties would likely have expected a court to have decided the gateway matter [of arbitrability],' [courts] assume that is what they agreed to. Thus, '[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.'" *First Options of Chicago, Inc.*, 514 U.S. at 944 (italics omitted, quoting *AT&T Technologies v. Communications Workers*, 475 U.S. 643, 649 (1986)).

In *Peleg v. Neiman Marcus Group, Inc.*, 204 Cal. App. 4th 1425 (Cal. Ct. App. 2012), the California Court of Appeals held that a delegation clause substantially identical to the delegation clause at issue here did not clearly and unmistakably delegate questions of enforceability to an arbitrator because "the delegation provision [was] not the only language in the Agreement that bears on who decides whether the Agreement" is enforceable. *Id.* at 1442. In *Peleg*, the court noted that the

1  arbitration agreement's delegation clause conflicted with a separate severability provision, which
2  stated that if "any court" determines that the agreement shall be unenforceable, that determination
3  would only be effective as to employees who reside in the state where such court is located. *Id.* The
4  court noted that the language in the delegation clause conflicted with that language, and thus was not
5  "clear and unmistakable." *Id.* After reviewing California cases addressing similar contractual
6  provisions, the *Peleg* court concluded "the inconsistency between the Agreement's delegation and
7  severability provisions indicates the parties did not clearly and unmistakably delegate enforceability
8  questions to the arbitrator." *Id.* at p. 1444.

9      Here, the Terms of Service contain similar conflicts about delegation. Defendant points to
10  Section 24.3 as containing the delegation clause, which states that an arbitrator "and ***not any federal,***
11  ***state or local court*** or agency [has] ***exclusive*** authority" to resolve enforceability issues. *See* Dkt. 36-
12  2 at 24 (emphasis added). Various terms found in these provisions directly contradict, or at least call
13  into question that "exclusive" delegation.

14      For example, in Section 24.2.5, the Terms of Service states that either party "may choose to
15  pursue a claim in small claims ***court***[.]" *Id.* (emphasis added). Further, Section 24.7.2 states that "[i]f
16  ***a court*** or arbitrator decides that this subsection [regarding Defendant's revisions to the arbitration
17  provision] is not enforceable or valid, then this subsection shall be severed[.]" *Id.* at 26 (emphasis
18  added). Likewise, Section 24.10.3 states that "[i]f any ***court*** or arbitrator determines that the
19  class/consolidated/representative action waiver set forth in this section is void or ***unenforceable*** for
20  any reason or that arbitration can proceed on a class, consolidated, or representative basis, then the
21  disputes, claims, or controversies will not be subject to arbitration and must be litigated in federal
22  court located in San Francisco[.]" *Id.* at 27 (emphasis added).

23      The delegation clause at issue here directly conflicts with these various sections that state a
24  *court* may determine enforceability on various topics. Importantly, the provision stating that a party
25  may choose to pursue a claim in its entirety in small claims court (which is undoubtedly considered a
26  "state or local court"), completely undermines the "exclusive authority" ostensibly delegated to an
27  arbitrator to determine issues of enforceability. *See, e.g., id.* at 24. The Court should hold similar to

28

*Peleg* that, with respect to the Terms of Service, "the Agreement's statement in the severability provision that a *court* may decide the question of enforceability creates an ambiguity as to whether an arbitrator should decide if an arbitration contract is enforceable." *Peleg*, 204 Cal. App. 4th at 1445.

Defendant cannot escape the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62-63 & fn. 10 (1995), *accord*, *C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Okla.*, 532 U.S. 411, 423 (2001). Under *Rent-a-Center*, 561 U.S. at 69 fn. 1, the parties must **clearly and unmistakably** agree that the arbitrator will decide whether the agreement is enforceable. "Ambiguous language, which we have here, does not suffice." *Peleg*, 204 Cal. App. 4th at 1445. Because there is ambiguity and contradictory language within the Terms of Service, Defendant cannot meet its burden to show there is a "clear and unmistakable" agreement to delegate issues of enforceability to an arbitrator.

### ii.     The delegation clause itself is unconscionable.

As discussed in Plaintiff's Motion for Partial Summary Judgment, the Terms of Service and the arbitration provision therein are unenforceable due to unconscionability. *See* Dkt. 35 at 23-31 (memorandum pages 17-25). Procedural unconscionability with respect to the delegation clause is present here because the arbitration provision (and delegation clause therein) are a contract of adhesion, drafted by a well-funded and sophisticated corporate entity, and were hidden on a separate webpage in such a way that users were forced to ferret through hyperlinks to find them. *See* Dkt. 35 at 23-24. Moreover, as discussed below, lay website users are not expected to know the legal intricacies and effects of a delegation clause.

If the Court were to compel the parties to arbitrate, even for the narrow purpose of determining whether the arbitration provision is itself unconscionable, many of the same indicators of substantive unconscionability would still befall Plaintiff with respect to delegation. For example, Defendant is allowed to select the pool of arbitrators, provides no mechanism for Plaintiff to contest the neutrality of that chosen pool, and Plaintiff is forced to incur and bear various costs associated with the arbitration. *See* Dkt. 35 at 25-26. Essentially, Defendant has crafted an agreement that Plaintiff never

1    assented to, that forces Plaintiff to spend unnecessary time and money to litigate a threshold issue of

2    enforceability of the arbitration clause in an arbitral forum (for which Plaintiff must share in the

3    arbitration costs), where Defendant is allowed to hand-pick the pool of arbitrators that will hear the

4    matter, and Plaintiff is not afforded the ability to contest those selected arbitrators' neutrality. This

5    demonstrates that the delegation provision itself is unconscionable, and should be rejected here.

6         In *Pinela v. Neiman Marcus Group, Inc.*, 238 Cal. App. 4th 227 (Cal. Ct. App. 2015), the

7    California Court of Appeals held a court, and not an arbitrator, may determine whether an arbitration

8    agreement is enforceable even in the face of a delegation clause. The court in *Pinela* determined that

9    the delegation clause was a contract of adhesion because it was drafted by a larger, sophisticated

10   corporate entity and presented on a take-it-or-leave-it basis. *Id.* at 243. The same is true here. *See* Dkt.

11   35 at 23-24. With respect to the delegation clause itself, the court noted that "Courts have recognized

12   that 'the issue of delegating arbitrability questions to an arbitrator is a "rather arcane" issue upon which

13   parties likely do not focus.'" *Pinela*, 238 Cal. App. 4th at 244 (citing *Tiri*, 226 Cal. App. 4th at 246).

14   As such, it was less likely that an unsophisticated layperson would understand how arbitrability

15   questions are to be resolved under the agreement. *Id.* The court determined that "there is more than

16   the minimum degree of procedural unconscionability that is always present with an adhesive contract.

17   Grasping the import and meaning of this particular delegation clause would have been beyond the ken

18   of most anyone in these rushed circumstances." *Id.* The same is true in the present action.

19        The *Pinela* court then turned to substantive unconscionability, finding that the delegation

20   clause worked in concert with a choice of law provision that would have precluded an arbitrator from

21   applying California unconscionability standards in making a determination on enforceability. *Id.* at

22   246. The court found that argument to have merit, and determined the delegation clause itself was

23   unconscionable. In so doing, the court focused on the interaction of the agreement's surrounding

24   provisions (such as the choice of law clause) with the delegation clause in determining it was

25   substantively unconscionable. *Id.* at 249.

26        The same principle applies here, where the interaction between the delegation clause and the

27   surrounding provisions work in concert to force Plaintiff to undergo a one-sided process and to incur

28

undue arbitration costs simply to contest the enforceability of the arbitration clause itself. As in *Pinela*, the Court should hold that such interaction between these provisions constitutes substantive unconscionability, and hold the delegation clause unenforceable.

Again, the Court need not consider the unconscionability or delegation questions at all if it decides in the first instance that Defendant has failed to provide sufficient evidence demonstrating an objective outward manifestation of Plaintiff's assent to be bound by the Terms of Service. Defendant has failed to make such a showing, and the motion to compel should be denied. Even if the Court were to address unconscionability, the parties never "clearly and unmistakably" reserved that question for the arbitrator, and any attempt by Defendant to impose such delegation was unconscionable and should be rejected.

As discussed in Plaintiff's Motion for Partial Summary Judgment, the Terms of Service and arbitration provision as a whole are unenforceable as a matter of fact, law, and common sense. As such, the Court should deny Defendant's motion to compel arbitration and allow the parties to move forward with this litigation in court.

## IV.    CONCLUSION

For the reasons stated herein, and because the Court must afford Plaintiff the benefit of all reasonable doubts and inferences, Plaintiff respectfully requests the Court find that Defendant has failed to carry its evidentiary burden demonstrating that Plaintiff assented to the arbitration agreement and deny Defendant's motion to compel. Plaintiff asks for such other and further relief to which she may be entitled at law or in equity.

Respectfully submitted,

Date: October 28, 2020

*/s/ William M. Hogg*
Matthew S. Weiler
Ryan M. Hecht
Peter B. Schneider
William M. Hogg
SCHNEIDER WALLACE
COTTRELL KONECKY LLP

*Attorneys for Plaintiff and Class Members*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court for the United States District Court, Northern District of California, by using the Court's CM/ECF system on October 28, 2020.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF system.

*/s/ William M. Hogg*
William M. Hogg

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION *Britt, et al. v. ContextLogic, Inc.*, Case No. 3:20-cv-04333-WHA